IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

JEREMIAH MATAU,

   Defendant.

CR. NO. 16-00744-DKW-6

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

  Defendant Jeremiah Matau is charged with conspiracy to distribute 50 grams or more of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A). Indictment, Dkt. No. 1.

  On June 13, 2016, and July 12, 2016, pursuant to Title 18, United States Code, Section 2518, district court judges approved orders for wiretaps on several telephone numbers as part of the investigation into Matau and his co-defendants. Motion to Suppress Evidence (Motion), Dkt. No. 515, at 1. On October 9, 2018, Matau filed a Motion to Suppress Evidence, challenging the sufficiency of the affidavits filed in support of those wiretap applications and the necessity of those wiretaps in the investigation that led to Matau's arrest. *Id.* The Government filed its Opposition on October 17, 2018. Government's Memorandum in

Opposition (Opp.), Dkt. No. 525. Matau did not reply. Counsel for both sides notified the court that they did not have witnesses or evidence to present at a hearing scheduled for October 22, 2018 and waived oral argument. Accordingly, with the agreement of counsel, the hearing was vacated. Dkt. No. 533.

Having completed review of the arguments presented in the parties' briefs, and the record herein, the Court finds that the two relevant affidavits and warrant applications meet the necessity requirement of Sections 2518(1)(c) and 2518(3)(c). Matau's Motion to Suppress is therefore DENIED.

## BACKGROUND

In June 2016, the Government was in the midst of a two-year investigation into a narcotics conspiracy involving dozens of individuals, including Matau, Laauli Amani and Jeremiah Ieremia, a co-defendant in the instant case. Opp. at 1; Gov't Ex. A. On June 13, 2016, the Government applied for wiretap authorization, pursuant to 18 U.S.C. §§ 2516 *et seq*., for telephone numbers purportedly used by these individuals. Motion at 1.

More specifically, the application requested permission to continue a wiretap of a telephone number used by Amani (identified as "TT11"), then already under surveillance pursuant to a May 4, 2016 wiretap warrant. June 13, 2016 Affidavit in Support of Application for Order Pursuant to 18 U.S.C. § 2516 (June Affidavit),

¶ 5.   The application also requested that surveillance be initiated on a telephone number purportedly used by Ieremia (identified as "TT13").   *Id.*   In support of the application, the Government submitted an affidavit from Jeffrey Koch, a Special Agent (SA) with the Federal Bureau of Investigation (FBI).   *Id.*   In the affidavit, SA Koch states that he is a case agent on the investigation into a drug conspiracy involving Matau, Amani, Ieremia, Daryl Kuresa and several others. *Id.* ¶ 4.   SA Koch also describes, over nearly thirty pages, the various law enforcement techniques employed in the investigation of this conspiracy as well as the law enforcement techniques purposefully not used in the investigation.   *Id.* ¶¶ 128-159.   On June 13, 2016, Judge Seabright approved the wiretap order for continuation of surveillance on TT11 and initiation of surveillance on TT13. Opp. at 1.

On July 12, 2016, the Government filed a renewal application to further continue surveillance on TT11 and to initiate surveillance on four additional telephone numbers, including two purportedly used by Ieremia (identified as "TT14" and "TT15").[1]   July 12, 2016 Affidavit in Support of Application for Order Pursuant to 18 U.S.C. § 2516 (July Affidavit), ¶¶ 8-10.   In the July

---

[1]The June 13, 2016 wiretap warrant did not include TT14 or TT15, but did include another telephone number, TT13, purportedly belonging to Ieremia.   The July 12, 2016 application did not request renewal of TT13; however, it did include a request to initiate surveillance on TT12, purportedly used by co-defendant Daryl Kuresa, and on TT16, purportedly used by a co-conspirator whose name was not known.   July Affidavit ¶¶ 8-10.

Affidavit, SA Koch once again describes at length the law enforcement

investigative techniques used, certain techniques not used, and the reasons those

techniques were not used. *Id.* ¶¶ 191-232. In addition, the July Affidavit

includes new information learned since the Government's June 2016 application,

including that Ieremia was using a new telephone number. *Id.* ¶ 155. On July

12, 2016, this Court signed the order granting the wiretap authorization. Opp.,

Gov't Ex. C at 175.

During the course of surveillance of TT13 pursuant to the June 13, 2016

Order and TT14 pursuant to the July 12, 2016 Order, law enforcement agents

recorded conversations in which Matau was heard speaking. Motion at 2.

Matau asserts, and the Government does not refute, that the Government intends to

introduce at trial evidence of some of these conversations or other information

derived from the surveillance of TT13 and TT14. *Id.* On October 9, 2018,

Matau filed the instant Motion. Dkt. No. 515.

## STANDARD OF REVIEW

Taken together, "§§ 2518(1)(c) and (3)(c) require a showing of necessity

before a district court can issue a wiretap order." *United States v. Carneiro*, 861

F.2d 1171, 1176 (9th Cir. 1988). As such, "the Government must show that

every wiretap it seeks is necessary." *United States v. Christie*, 825 F.3d 1048, 1066 (9th Cir. 2016).

In *United States v. Rodriguez*, the Ninth Circuit describes the necessity analysis as a two-part assessment: First, under 18 U.S.C. § 2518(1)(c), a wiretap application must include a "full and complete statement" as to the "facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued," including whether traditional investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. 851 F.3d 931, 938. The court reviews *de novo* whether the application includes such a statement. *Id.*

Second, if the affidavit meets the "full and complete statement" requirement, the court then reviews the issuing court's conclusion that the wiretap was necessary. *Id.* The issuing judge's decision that the wiretap was necessary is reviewed for abuse of discretion. *United States v. Lynch,* 437 F.3d 902, 912 (9th Cir. 2006) (*en banc*); *United States v. Blackmon,* 273 F.3d 1204, 1207 (9th Cir. 1986)).

## DISCUSSION

Matau challenges both the June and July 2016 wiretap orders on the basis that the two related applications fail the combined Sections 2518(1)(c) and 2518(3)(c)

necessity requirement.    In particular, Matau argues that the Government's affidavits did not sufficiently explain what traditional law enforcement techniques had been used, and even where they did, portions of the affidavits employed common verbiage in describing those techniques, copying directly from affidavits in support of previous wiretap applications.    Motion at 2-6.    Second, Matau argues that the wiretaps were not necessary because other techniques could have been used to gather information about Ieremia.    Motion at 6-9.    Because neither contention has merit, the Motion to Suppress is DENIED.

## A.    *The Affidavits Provide a Full and Complete Statement Regarding Traditional Law Enforcement Techniques*

Matau argues that the affidavits in support of the June and July 2016 Orders did not contain "full and complete statements" of the law enforcement techniques employed or considered, as required by Section 2518(1)(c).    In furtherance of this insufficiency argument, Matau relies on two arguments: (1) that the affidavits in support of the applications repeat information found in previous wiretap applications (from the same investigation) when describing the types of law enforcement techniques attempted; and (2) that the affidavits improperly relied on information about one co-conspirator, Amani, to obtain a wiretap on another co-conspirator, Ieremia.

1.      *Repetition of Information between Affidavits is Immaterial to a*
        *Sufficiency Showing*

Matau argues that the "copying and pasting" of information from the affidavit in support of the May 2016 application into the affidavit in support of the June 13 application—and later used in the July 12 affidavit—renders the affidavits insufficient under Section 2518(1)(c).   Nothing in the law supports this conclusion.

Matau begins, ". . . comparing the June 13, 2016 Application with the May 4, 2016 application, the differences in the affidavit supporting the June 13 Application are minimal . . . Paragraph 130 of the June 13 application is simply the exact same language in May 4's paragraph 129 . . ."   Motion at 3.   This comparison continues, "the section[s] regarding trash collection are identical in the May 4 affidavit and the June 13 affidavit.   The section regarding telephone records are identical in the two affidavits as well . . ."   *Id*. at 5.

Matau makes essentially the same argument with respect to the July 12, 2016 application, noting that it is "invalid" because "[t]he section of the July 12 affidavit regarding physical surveillance is exactly the same as the corresponding section of the June 13 affidavit . . . Sections on the July 12 affidavit regarding trash collection, telephone records, use of undercover officers, use of confidential

informants, and federal grand jury are exactly the same as the corresponding sections in the June 13 affidavit . . . "   *Id.* at 7.

As Matau acknowledges in his Motion, the law requires that "each wiretap application, standing alone, must satisfy the necessity requirement."   Motion at 3 (citing *Carneiro*, 861 F.2d at 1176).   It follows from this principle that if each application, standing alone, must satisfy the necessity standard, the proper inquiry is not how one application compares to its predecessor but rather whether contained within the four corners of each affidavit is a full and complete recitation of the statutorily required information.

Matau's citation of information repeated in the May 2016, June 2016, and July 2016 applications is of little consequence.   He offers no explanation, legal basis, or reasoning as to why the mere repetition of some information from one renewal application to the next demonstrates that the affidavits were insufficient and incomplete statements of the traditional law enforcement methods employed or considered.   Indeed, each of the affidavits in question thoroughly discusses a multitude of law enforcement techniques either employed or considered, including physical surveillance, trash collection, telephone records, undercover officers, confidential informants, the federal grand jury, search warrants and seizures, arrests, other interceptions, police records, tracking devices, mail covers, and video

surveillance. The approximately 30-page description explains either why a specific technique failed to yield the needed information when attempted or why the technique would either be too dangerous or futile to attempt. Matau does not identify a single law enforcement technique that should have been included but was not, that was not described truthfully, or that was incomplete.

Instead, Matau erroneously relies on *Blackmon* for the proposition that because "the two applications are near carbon copies of one another, the applications are "invalid." Motion at 5 (citing *Blackmon,* 273 F.3d at 1207). *Blackmon*'s holding is not nearly so broad. The court in *Blackmon* found only that where an application, "which is nearly a carbon copy of a previous application *for a different suspect*, *contains material misstatements and omissions* regarding the necessity of a wiretap [and] purged of [these statements], the application contains *only generalized statements that would be true of any narcotics investigation,*" the application is insufficient. *Blackmon*, 273 F.3d at 1208 (emphasis added). Here, Matau does not even contend that certain information carried over from each application was not true or that there were any material

misstatements.[2]   Nor does he argue that the Government affidavits contain only generalized statements that would be true of any narcotics investigation.

Rather than seeking originality, the law requires that the information contained in an affidavit in support of a wiretap application sufficiently describe the particular circumstances and facts of the specific case.   And "the reason for requiring specificity is to prevent the Government from making general allegations about classes of cases and thereby [sidestep] the requirement that there be necessity in the particular investigation in which a wiretap is sought." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985).   The "carbon copy" language that Matau objects to describes exactly the techniques used in the investigating *this particular* conspiracy.   The identical information found in both applications was carried over precisely because it continued to be true of the ongoing investigation into Ieremia, who was a target of wiretaps in all of the relevant affidavits.

Moreover, because the wiretaps of Amani and Ieremia's telephones were *continuations* of previous applications for surveillance—even if the telephone numbers themselves were, in some cases, different—the information is unsurprisingly nearly identical.   In an ongoing investigation involving the same

---

[2]Matau identifies two typos that were carried over between the June and July Affidavits. Motion at 4.   While Matau uses these typos as evidence of information being carbon-copied between affidavits, he does not assert that the typos amount to material misstatements.

members of a conspiracy who switch telephone numbers frequently, the Court

would expect continuity in the information provided in affidavits between

applications.    This is especially true where, as here, the challenged applications

were only one month apart.    Thus, the repetition of facts between the two

affidavits does not raise concerns that the affidavits failed to provide "a full and

complete statement" as to the law enforcement techniques used or considered prior

to seeking wiretap authorization.

> 2.    *The Affidavits Did Not Improperly Rely on Information about the Investigation into Amani*

The second basis for Matau's insufficiency argument is that the affidavits

described only the techniques used as an alternative to tapping Amani's telephone.

According to Matau, the Government then "bootstrapped" the wiretap of Ieremia's

telephone onto the justification for the Amani wiretap.    Citing *United States v.*

*Brone,* 792 F.2d 1504, 1506 (9th Cir. 1986), for the proposition that "the

Government may not dispense with the statutorily mandated showing of necessity

to obtain a wiretap of [an individual's] telephone, despite the validity of the

wiretap of his coconspirators' telephone," Matau contends, "all of the necessity

discussion was about Amani."    Motion at 8.

Matau's characterization of the affidavits as describing necessity only as to

Amani is plainly inaccurate.    Of the thirteen investigative techniques identified in

the affidavits, two are described as being used specifically to investigate Ieremia: pen register/trap and trace devices, and wiretaps on other telephone numbers. June Affidavit ¶¶ 145 and 157-158; July Affidavit ¶¶ 215 and 227-228. The affidavits also describe why physical surveillance and the use of an undercover officer—both of which were actually employed—would be ineffectual, specifically with respect to Ieremia.[3] June Affidavit ¶ 136 (Ieremia notes that "cops were like two miles up" leading Government to conclude that Ieremia has heightened awareness of the location of law enforcement) and ¶ 146 (Undercover Officer #1 "does not have access to Amani or Ieremia"); July Affidavit ¶ 204 and ¶ 216.

In addition, the June Affidavit describes how previously-authorized wiretaps on other telephone numbers used by Ieremia had demonstrated that Ieremia was in contact with the members of the conspiracy via telephone. June Affidavit ¶ 158. At that point in the investigation, law enforcement believed they had identified Matau as a co-conspirator, located in California, with whom Ieremia coordinated the shipment of narcotics into Hawaiʻi, but they had been unable to learn anything more. *Id.* ¶ 126. The June Affidavit states that Ieremia informed a co-conspirator via telephone that "Matau is pressuring Ieremia to sell

---

[3]Although Matau dismisses the Government's assessment of Matau's "heightened awareness" of law enforcement because it was the product of an unrelated traffic incident (Motion at 4), the argument lacks merit because the required showing is not that physical surveillance would likely fail for some reason related to the subject matter of the investigation; the Government need only show that it would likely fail.

methamphetamine faster." *Id*. The same affidavit further states that "Matau does not appear to have been intercepted on any court authorized interceptions in this case." *Id.* The affidavit concludes that the objective of additional wiretaps is to identify "Ieremia's specific methods of importing methamphetamine to Hawai'i." The July Affidavit contains the same information. July Affidavit ¶¶ 191-232. Given that Ieremia was in contact with Matau about how to import narcotics into Hawai'i and that law enforcement had yet to intercept a conversation between the two, the information provided in the affidavits explains why wiretaps on additional telephone numbers used by Ieremia were necessary to allow the Government to learn how Ieremia was coordinating with Matau.

Matau specifically challenges the information in the affidavit as to why surveillance of Ieremia was not feasible in lieu of a wiretap. Motion at 8. Matau relies on *Brone* to argue that the behavior of co-conspirators is not relevant to the showing that physical surveillance of Ieremia would be futile. *Id.* But the conclusion in *Brone* is nuanced:

> the Government may not dispense with the . . . showing of necessity to obtain a wiretap of [an individual's] telephone, despite the validity of the wiretap of his coconspirators' telephone . . . *although [an individual's] connection with conspirators who are themselves so wary that a wiretap is necessary in order to investigate their criminal activities may be a factor that weighs in favor of authorizing the tap*.

*Brone*, 792 F.2d at 1506 (emphasis added).

Here, the Government has extensively described why the behavior of co-conspirators necessitated the use of wiretaps.    June Affidavit ¶¶ 128-142. While those facts *alone* may be insufficient to show that Ieremia's criminal activity was likewise not amenable to investigation via physical surveillance, those facts are neverthelss relevant to the inquiry.    Moreover, the affidavit presented extensive additional facts and analysis to bolster the Government's assertion that physical surveillance would not succeed: Ieremia's heightened awareness of law enforcement presence; the fact that other surveillance methods had been attempted on Ieremia and failed to reveal how he was importing narcotics into Hawaiʻi; and Ieremia's suspected high-level role in the organization, such that he would not likely be involved in ground sales where physical surveillance might be more productive.

These facts, in combination with the behavior of his co-conspirators, provide a complete picture as to why physical surveillance of Ieremia would not likely yield the necessary investigative results.    The standard for evaluating the Government's showing that traditional law enforcement techniques would be futile is one of reasonableness.    *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977).    Based on the results of the investigation at the time, the Government's

showing that physical surveillance would not likely yield information about Ieremia's methods of importing narcotics into Hawai'i satisfies the reasonableness standard.

Moreover, Matau's argument about physical surveillance of Ieremia conflates the required showing that alternative methods have been attempted or are futile with a showing that *all other* law enforcement methods have been exhausted and proved ineffective. Arguing that the affidavits do not describe attempted physical surveillance of Ieremia, Matau asserts: "noting that Ieremia switched phones is not an attempt at physical surveillance[…]." Motion at 6. Similarly, Matau challenges the description of Ieremia's "heightened awareness of law enforcement presence" as failing to demonstrate an actual attempt at physical surveillance of Ieremia. *Id.* These arguments confuse the relevant requirement: the necessity analysis does not require that the Government show that it attempted every form of traditional surveillance. As the Ninth Circuit has explained, even absent a showing that various techniques were used, the Government can prove necessity if it "reasonably attest[s] that the unused tools were unlikely to succeed." *United States v. Gonzalez,* 412 F.3d 1102, 1113 (9th Cir. 2005) (affirming suppression of a wiretap where the Government had "conducted only the most cursory investigation before seeking a wiretap" but emphasizing that "we are

cognizant that the necessity requirement should not be interpreted to require law enforcement to exhaust every possible technique before resorting to wiretapping.") The Government is required to *either* (1) describe how the law enforcement technique was used and how it failed to yield the necessary information or evidence; *or* (2) explain why a law enforcement technique was not used.    In describing Ieremia's switching telephones and heightened awareness of law enforcement, the Government is not describing an attempt at physical surveillance of Ieremia; it is explaining why physical surveillance would have been futile if attempted.

The universe of law enforcement techniques that the Government must at least consider is further clarified in *Ippolito* in which the Ninth Circuit limited the required showing to only those techniques that "easily suggest themselves and are potentially productive."    774 F.2d at 1486.    The Government has met the requirements of *Gonzalez* and *Ippolito* by explaining why certain methods were not used because they were not "potentially productive" and were "unduly dangerous." Where an affidavit "convincingly details why, using [the agent's] professional judgement and his experienced opinion, traditional investigative techniques would not suffice," the affidavit is adequate to survive a motion to suppress.    *Spagnuolo*, 549 F.2d at 710; *cf. U.S. v Kalustian*, 529 F.2d 585, 587 (9th Cir. 1975) (holding

that an affidavit containing only conclusory statements that other investigative techniques "contain little probability of success," without any factual allegations to support the conclusion, was insufficient to support the wiretap application.) The affidavits here explain that physical surveillance would be futile because of, *inter alia*, Ieremia's heightened awareness of law enforcement's location and the fact that his role in the conspiracy was to coordinate drug shipments rather than participate in street-level sales, as well as because of the conspiracy's extensive methods of evading physical surveillance. June Affidavit ¶¶ 128-142. This showing of futility, with specificity to the facts of this case, is all that the law requires.

Read in their entirety, the affidavits adequately describe traditional law enforcement techniques attempted— both in the investigation of the conspiracy and in the investigation of Ieremia specifically— and explain why certain techniques would have been futile or dangerous and were thus not attempted. Nothing in the Motion disturbs that assessment. Accordingly, Matau's arguments to the contrary do not provide a basis on which to suppress the evidence obtained by the June and July 2016 court-authorized wiretaps.

**B.** *The District Court Did Not Abuse Its Discretion in Finding that the Wiretaps Were Necessary*

The sole basis for Matau's challenge to the district court's finding of necessity of the wiretaps is that certain law enforcement techniques were not employed to investigate Ieremia.   Matau asserts that "there was no meaningful attempt made at using traditional investigation techniques to surveil Ieremia" and "a District Court must reject a wiretap application if law enforcement officers have not first attempted, without success, traditional investigative methods."   Motion at 6 and 8.   Matau further states, "it is difficult to say that law enforcement conducted any investigation whatsoever" into Ieremia because the Government "relies upon the investigation undertaken for the Amani wiretaps."   Motion at 9.

This characterization of the investigation of Ieremia is simply inaccurate. As described extensively above, the investigation of Ieremia included the use of pen register and trap and trace devices, wiretaps on at least one other telephone number used by Ieremia, review of the information yielded through those wiretaps of Ieremia's telephone, and wiretaps on telephones used by co-conspirators in which Ieremia is recorded discussing a narcotics distribution conspiracy.

Moreover, Matau erroneously implies that the necessity of a wiretap on telephone numbers used by Ieremia could not be based on information regarding the behavior of co-conspirators and knowledge about the nature of the conspiracy. The Ninth Circuit has held that "statements pertaining to the conspiracy in general

can be used to show why an investigative technique would be too dangerous or unproductive in regard to all of the target subjects listed in a single wiretap application, so long as they are supported by facts specific to the *case*." *Rodriguez,* 851 F.3d at 939–40 (emphasis added). Throughout the affidavits, the Government makes a particularized showing of why law enforcement techniques failed with respect to this specific drug conspiracy, as required by *Rodriguez.* The ineffectiveness of traditional law enforcement techniques in gathering the necessary information, in combination with the need to uncover how narcotics were being imported into Hawaiʻi, can properly serve as the basis for the conclusion that a wiretap was necessary on Ieremia's telephone.

Furthermore, in the instances when the Ninth Circuit has found abuse of discretion in the necessity determination, it has generally been because "a wiretap should not ordinarily be the initial step in the investigation." *United States v. Bailey,* 607 F.2d 237, 241 (9th Cir. 1979); *see also United States v. Rivera,* 527 F.3d 891, 902 (9th Cir. 2008); *United States v. McGuire,* 307 F.3d 1192, 1196 (9th Cir. 2002). Here, the use of a wiretap on Ieremia's new telephone number was not the first investigative step. Over the course of its then two-year investigation, the Government had used confidential informants, pen registers, undercover officers, physical surveillance, controlled purchases, and various other techniques

to gather information about the conspiracy. The Government had also used at least ten other wiretaps throughout the investigation, including at least one on a telephone used by Ieremia. The authorizing judges were correct in assessing that the wiretap applications did not seek to prematurely use wiretaps in order to sidestep the use of traditional investigative techniques. The investigation into Ieremia easily overcomes the concern, outlined in *Bailey* and its progeny, that wiretaps not be the first technique employed by law enforcement in a given investigation.

Finally, the Ninth Circuit has also held that, while wiretaps should not be the initial step, " . . . law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." *McGuire*, 307 F.3d at 1196. Even when alternatives *could* have been employed and were not, the authorizing judge may still reasonably find that a wiretap was necessary. *United States v. Bennett,* 219 F.3d 1117, 1122 (9th Cir. 2000) (holding that even if other investigative techniques may be successful, that is not enough to "extinguish the need for the wiretap."); *see also United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006) ("the necessity for the wiretap is evaluated in light of the Government's need not merely to collect some evidence, but to 'develop an effective case against those involved in the conspiracy.'" )(citing *Brone,* 792 F.2d at 1506); *McGuire,* 307 F.3d at 1198-99

(defining "effective case" as "evidence of guilt beyond a reasonable doubt");

*United States v. Canales Gomez*, 358 F.3d 1221, 1224–25 (9th Cir. 2004)

("Though traditional methods had unearthed some preliminary information

regarding these matters, without the wiretaps, the investigators could not penetrate

the inner workings of the drug conspiracy . . . The affidavit adequately explained

that the interception of wire communications was the *only* way to identify and

investigate the whole of the network, including the entire hierarchy of suppliers,

transporters, distributors, customers, and money launderers.") (citations omitted).

Much like in *Bennett*, *Canales Gomez*, and *Brone*, the Government here was

seeking information about members of the conspiracy who were directing the

narcotics distribution, rather than participating directly in street sales.    June

Affidavit ¶¶ 125-130.    Despite its extensive investigation, key pieces of evidence

were still missing.    Thus, even if, as Matau argues, the affidavits had been

entirely silent as to physical surveillance of Ieremia, the authorizing judges would

have had the discretion to conclude that the wiretaps were nonetheless necessary.

Here, the Government showed that it had attempted or considered at least

thirteen traditional techniques, but nevertheless, had been unable to identify the

means through which Ieremia and the other members of his conspiracy were

importing narcotics into Hawaiʻi.    Despite the early success of confidential

informants and undercover officers, the Government still needed to learn key information about the conspiracy, including participants' roles and methods, that was more likely to be transmitted via telephone conversations among the high-level members of the conspiracy than revealed through alternative investigative techniques. As a result, the conclusion that the wiretaps were necessary is amply supported by the thorough information contained in the affidavits, and there is no indication that either judge abused his discretion in authorizing the June or July 2016 wiretaps.

## CONCLUSION

Based upon the foregoing, Matau's Motion to Suppress, Dkt. No. 515, is DENIED.

IT IS SO ORDERED.

Dated: November 6, 2018 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge

*United States v. Matau,* CR 16-00744 DKW; **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**